# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHARLES JOSEPH BRIXIUS,** | **1:17-cv-00114-LJO-EPG** |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| **AMERICAN TRANSFER CO., a California corporation; AMERICAN TRANSFER CO. PENSION PLAN,** | **PLAINTIFF MAY FILE AN AMENDED COMPLAINT WITHIN 14 DAYS** |
| Defendants. | **(Doc. 7)** |

## I. INTRODUCTION

Before the Court is Defendant American Transfer Company and American Transfer Company Pension Plan's (collectively, "Defendants" or "ATC") motion to dismiss Plaintiff's complaint. (Doc. 7.) The complaint seeks benefits pursuant to the Employee Retirement Security Act of 1974 ("ERISA") under a "de facto" pension plan established by his former employer, ATC, in 2005. Defendants contend Plaintiff has failed to allege the existence of an ERISA plan that meets the necessary prerequisites for a claim for benefits under 29 U.S.C. § 1132(a)(1)(B). The matter was found suitable for a decision without oral argument, and the hearing on Defendants' motion was vacated. For the reasons set forth below, Defendants' motion to dismiss is granted; Plaintiff's complaint is dismissed without prejudice and with 14-days leave to amend.

1

## II. FACTUAL BACKGROUND

The complaint alleges that Plaintiff was employed by ATC from 1968 through 2004 where he worked full-time as a non-union internal accountant and bookkeeper. On several occasions during the 1980s, attempts or discussions were had about trying to have the office employees become unionized. Plaintiff had conversations with the owner and President of ATC, Glenn Prickett, about whether ATC employees would become unionized. Mr. Prickett proposed that, if Plaintiff would continue to work at ATC and refrained from unionizing office workers, ATC would "take care of providing a retirement plan" for Plaintiff that would equal Plaintiff's salary at the time of retirement, plus the amount paid towards his health benefits.

Plaintiff refrained from unionizing activities and maintained his employment with ATC until the end of 2004 when he retired. At the time of his retirement, he was receiving a salary of $45,000 per year and group medical benefits of 258.76 per month. From January 2005 through 2010, ATC paid $45,000 per year plus $3,105.12 for his medical benefits. As to the $45,000 annual amount, ATC paid in bi-monthly installments through its payroll system as though Plaintiff were still employed, deducting federal taxes, social security, medical, state taxes, and state disability from these payments. Starting in January 2011, the $45,000 yearly retirement amount was, without any notice or explanation, reduced to $24,000 per year and paid at the amount of $2,000 per month, although payment of the medical benefit amount continued as before. Upon inquiry, Plaintiff was not provided any information about the reduction or any process how to appeal or purse a claim for the unilateral reduction of his benefits.

In January 2012, the retirement benefits were further reduced to $12,000 per year, paid monthly through ATC's payroll system subject to all the payroll deductions, which continued through 2015. The amount paid for medical benefits remained unchanged. On December 29, 2015, Plaintiff received a hand-written note from ATC indicating ATC would be closing and his last check would be paid in June 2016. Upon inquiring with John Moffatt, ATC's CPA, Plaintiff was told that the lifetime payments promised to Plaintiff were for the life of ATC, not for Plaintiff's life.

2

Plaintiff claims the representations made to him during his employment that he would receive a retirement benefit if he refrained from attempting to unionize office employees, in conjunction with the last 11 years of payments since his retirement, constitute a pension plan under ERISA. Plaintiff maintains ATC improperly reduced the amount of his retirement benefits in 2011 and 2012, and then improperly discontinued payments in 2016.

Defendants filed a motion to dismiss arguing Plaintiff has failed to adequately allege the existence of a de facto pension plan under ERISA. According to Defendants, Plaintiff's allegations of the details of a "plan" are vague and conclusory. Moreover, an ERISA plan requires an "administrative program," which must involve an ongoing, particularized, administrative discretionary analysis. Defendants maintain Plaintiff's allegations do not establish an administrative program, and no viable ERISA plan is alleged.

### III. LEGAL STANDARD – MOTION TO DISMISS

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550

U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements'. . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint...must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## IV. ANALYSIS

The parties dispute whether Plaintiff has adequately alleged a "plan" that implicates ERISA. The existence of an ERISA plan requires (1) a plan, fund, or program; (2) established or maintained; (3) by an employer; (4) for the purpose of providing benefits; (5) to its employees. *See Kanne v. Connecticut Gen. Life. Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988).

As it is not well defined by statute, the existence of a "plan" under ERISA can be difficult to determine. Numerous courts, including the Ninth Circuit, have embraced the Eleventh Circuit's decision in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (en banc). The *Donovan* court held that "a 'plan, fund or program' under ERISA is established if from surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 1373. A plan may be a mere practice or arrangement without a written document so long as it confers benefits captured within the scope of pension or welfare benefit plans. *Id.* Although ERISA requires formalities such as a written plan document, the

failure to comply with such requirements will not avoid ERISA-plan status. *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985) ("Although ERISA contains numerous requirements that a plan must adhere to – a written instrument, named fiduciaries, public reports, etc. – these requirements are not part of the definition of a 'plan.'") (citations omitted).[1]

In 1989, the Supreme Court expounded on the characteristics of an ERISA plan in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1989). In that case, a Maine state statute required employers to pay severance benefits when an employer closed its factory plant. When Fort Halifax Packing Company discontinued its operations in 1981, employees brought suit under the statute seeking severance pay. Fort Halifax argued the statute was preempted by ERISA, but this assertion was ultimately rejected by the U.S. Supreme Court. The Court explained the statute failed to implicate the regulatory concerns of ERISA. Specifically, ERISA refers to employee benefit plans, not employee benefits; the goal of ERISA's preemption provision is to provide a single set of administrative practices for benefit plans to avoid a patchwork scheme of regulation. The court noted, however,

> [t]his concern only arises . . . with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to *plans*, rather than simply *benefits*. Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

*Id.*, at 11-12. Turning to the statute, the Court reasoned that a "one-shot" cash payout of severance to employees who were terminated as a result of discontinued operations could not be characterized as an "administrative scheme." As the statute did not require employers to maintain employee benefit *plans*, and because there was no need to create an administrative scheme to make a one-time lump payment, the Court held that the ERISA pre-emption provision did not apply. In other words, an agreement to pay severance benefits may constitute an employee welfare plan, but such an agreement is subject to

---

[1] In *Golden Gate Restaurant Ass'n v. City & Cnty. of S.F.*, 546 F.3d 639, 651 (9th Cir. 2008), the Ninth Circuit recognized *Scott* was abrogated on other grounds by the Supreme Court in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1989). To the extent *Scott* did not consider whether the plan required an ongoing administrative scheme, the court's finding of a "plan" in *Scott* "is almost certainly no longer good law."

5

ERISA's control only if it creates benefits requiring "an ongoing administrative program to meet the employer's obligation." *Id*. at 11.

Thus, a "plan" under ERISA exists where a reasonable person is able to "ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits," *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 938-39 (9th Cir. 2003) (citing *Donovan*, 688 F.2d at 1373), and the nature of the benefit bestowed necessitates an "ongoing administrative program," *Fort Halifax*, 482 U.S. at 12.

Defendants first argue the complaint fails to allege the basic elements under *Donovan* because Plaintiff has not alleged why he believed there was a source of financing or what the administrative scheme entailed. Plaintiff has adequately alleged the intended benefits included his $45,000 salary at the date of retirement plus payment of an annual medical benefit of $3,105.12. (Doc. 1, ¶¶ 8-10.) The pension benefit was to begin upon his retirement and was to continue for his life; after Plaintiff retired at the end of 2004, ATC began paying him a retirement amount of $45,000 plus $3,105.12 in medical benefits each year. (Doc. 1, ¶ 11.) Plaintiff was the intended beneficiary, so long as he agreed to forego unionizing activities during his employment. The source of financing is alleged to come from ATC's general assets, and was actually made through ATC's general payroll system. There are very few allegations regarding the procedures for receiving the benefits, other than benefits were payable upon retirement and the payments were made through payroll as though Plaintiff were still employed. Although lacking a high degree of specificity, Plaintiff believed upon his retirement, he would receive payment from ATC in the promised amount. At the pleading stage, these facts are sufficient to allege the *Donovan* elements.

Turning to the *Fort Halifax* requirement, Defendants also argue Plaintiff has not alleged any "ongoing, particularized, administrative discretionary analysis" that could comprise an "administrative program" under ERISA. Plaintiff maintains the program ATC set up to make payments to Plaintiff pursuant to the agreement evidences an ongoing administrative program. Specifically, ATC created a

"charade or fabrication" by paying Plaintiff through payroll when he no longer was employed at ATC, had no work schedule, and never came onto the ATC office or grounds.

In several cases, the Ninth Circuit has considered whether promised benefits necessitate an ongoing administrative scheme under *Fort Halifax* – and thus constitute a "plan" pursuant to ERISA. In *Bogue v. AmPex Corp.*, 976 F.2d at 1319, 1323 (9th Cir. 1992), the court held the ongoing administrative scheme requirement was satisfied where "the program's administration required a case-by-case, discretionary application of its terms." The benefits at issue provided certain executives a severance package in the event the company was sold and the acquisition company failed to offer "substantially equivalent employment" which included responsibilities similar to those under the original company. In finding this implicated an ongoing administrative scheme, the court explained the administrator remained obligated to determine whether a complaining employee's job was "substantially equivalent" to his pre-acquisition job. Although the plan was triggered by a single event that would occur no more than once, it would occur at a different time for each employee. There was no way to carry out the obligation with an "unthinking, one-time, nondiscretionary application" because the program required a case-by-case discretionary application of its terms. *Id.* As such, an administrative scheme was required to deliver the promised benefit. *Id.*

Where conferring the promised benefit requires only slight discretion by the employer, the Ninth Circuit has concluded ERISA is not implicated. *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997); *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994). *Delaye* involved a severance agreement entitling the CEO to his yearly compensation if he were terminated for cause, prorated to the date of termination; if the termination was without cause, the CEO was entitled to a fixed monthly amount for twelve to twenty-four months according to a set formula, including other benefits such as accident, health, and life insurance. The court reasoned that, although the payment could continue for as long as two years, there was nothing discretionary about the timing, amount, or form of the payment; further, the severance calculation was a straightforward computation

of a one-time obligation. There was nothing about Delaye's promised benefit that would require decision-making that obligated an administrator to engage in an "ongoing, particularized, administrative, discretionary analysis" like the benefits bestowed in *Bogue*. The benefits promised in *Bogue* also related to more than one employee, which meant the discretionary analysis would need to be engaged at different times for multiple employees. The court concluded that sending the CEO, a single employee, a check every month plus continuing to pay his insurance premiums for the time specified by the contract did not rise to the level of an ongoing administrative scheme. *Id.* at 238.

The Ninth Circuit reached the same conclusion regarding a severance agreement in *Velarde* where an employer ("PACE") planning to close its operations issued a "Stay On Letter" to certain employees offering them a "stay on bonus" and severance pay if they agreed to work for several weeks after the warehouse closed. 105 F.3d at 1317. The bonus totaled four weeks of pay at the employee's base rate of pay and the severance was to be computed at the same rate with one week of severance for each full year of employment with the company. After the employees accepted the offer, PACE reneged on closing the warehouse and sold it to Sam's Club instead. The employees continued to work for Sam's Club, but they demanded that PACE pay them the stay on bonus and severance pay; PACE refused, and the employees filed suit. PACE asserted ERISA preempted the employees' breach of contract claim. On appeal, the court held the Stay On Letter was not a "plan" for purposes of ERISA preemption because it necessitated no "ongoing administrative scheme": to qualify for the benefit, employees had only to work until the required date, and PACE was required to exercise no discretion in implementing the agreement. *Id.* at 1317.

Here, Plaintiff asserts the promised benefit resulted from his

> conversations with Glenn Prickett, the President and owner of ATC, about whether or not the ATC office employees would become unionized. Glenn Prickett told [Plaintiff] not to attempt unionizing the office employees in order to obtain retirement benefits, but rather, if [Plaintiff] would continue to work at ATC and not try to unionize the office workers, ATC would take care of providing a retirement plan for [Plaintiff] that would provide his medical benefits plus an annual amount that would equal his annual salary at the time of retirement.

8

(Doc. 1, ¶ 8.) Plaintiff refrained from attempts to unionize the office employees and continued his employment with ATC until 2004, at which time he was receiving $45,000 per year in salary compensation and group medical benefits in the amount of $258.76 per month. After retirement and commencing in 2005, Plaintiff continued to receive a payroll check from ATC as though he were still employed. The payments were to be based on his annual income at the time of his retirement. In 2011 and 2012, the amount of Plaintiff's benefit was reduced, but it continued to be paid as though he were employed by ATC. Plaintiff maintains the manner in which ATC processed and paid his retirement benefit establishes an ongoing administrative plan − ATC created an accounting fiction to pay him as though he were still employed, which required ongoing oversight.

Plaintiff has not alleged facts showing his pension benefit necessitates an ongoing administrative scheme under *Halifax* for ATC to meet its obligations under the agreement. As alleged, the promised benefit was not contingent on any discretion by ATC and required only a cash payment of a sum certain for the duration of Plaintiff's life, which was not subject to any changing circumstances or ongoing eligibility requirements – similar to *Velarde* and *Delaye*. As explained by the Sixth Circuit in *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 517 (6th Cir. 1995) (internal citation and quotation marks omitted),

> [i]n determining whether an ERISA plan exists, the pivotal inquiry is whether the plan requires an establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such a scheme; rather an employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

"The hallmark of an ERISA benefit plan is that it requires an ongoing administrative program to meet the employer's obligations." *Fort Halifax*, 482 U.S. at 11. Plaintiff emphasizes that his benefits were paid out of a biweekly payroll system as though he were still an employee and argues this shows an ongoing administratively scheme as ATC had to oversee all the deductions and create an accounting fiction to make the payments. The complexity or simplicity of the actual accounting manner in which

ATC paid the benefits, however, is not definitive. The question is whether the nature of the benefit promised necessitated an ongoing administrative program that required ATC to act with a degree of discretion. Plaintiff's alleged benefit is a sum certain each year, quickly and easily reducible to a simple calculation with no discretion on the part of ATC to either increase or decrease the amount due. Unlike the agreement in *Bogue*, ATC has no discretionary determinations to make about Plaintiff's eligibility for the benefit. According to Plaintiff, he was entitled to the retirement payments by foregoing any unionization efforts during his employment with ATC – thus his entitlement to the benefits sprung into being as of the date of his retirement. As a definitive monetary sum, Plaintiff's retirement benefit was not subject to claims procedures, unlike a benefit such as education aid that may be available only upon meeting certain criteria for which an employer would have to process a request.

Moreover, although the benefit was to be paid over an indefinite period of years – the duration of Plaintiff's life – the fact that a monetary benefit is not a one-time payment does not imply the need for ongoing administration. For example, in *Delaye*, the severance benefit at issue could have been payable over the course of two years, but the court found this did not implicate a plan under ERISA because "[s]ending Delaye, a single employee, a check every month plus continuing to pay his insurance premiums for the time specified in the employment contract does not rise to the level of an ongoing administrative scheme." 39 F.3d at 237.

Plaintiff argues his promised retirement benefit constitutes a "plan" analogous to *Suda v. BP Corp. N.A., Inc*., 2006 WL 1049224 (5th Cir. 2006) (unpublished), where the court concluded a severance agreement implicated ERISA. *Suda* is factually distinguishable. In that case, the severance benefit was subject to a variety of deductions. Plaintiff contends his benefit is not subject to *any* deductions, and payroll deductions made by ATC violated the agreement. Further, the benefits in *Suda* involved criteria for determining an employee's eligibility, two levels of claim procedures involving employer discretion, and ongoing administration of health, life, relocation, and educational aid benefits. Unlike *Suda*, ATC can meet its alleged obligations under the agreement by simply writing Plaintiff a

check for the total amount due, which Plaintiff claims is $48,105.12 per year for his life commencing in 2005.

At the pleading stage, extremely detailed factual allegations are not required, but to allege an ERISA "plan," there must be some showing the nature of the benefits promised required ATC's ongoing administrative oversight and some degree of discretion in order for ATC to meet its obligations under the agreement. *Fort Halifax*, 482 U.S. at 11. Accepting Plaintiff's factual allegations as true – which is required at the pleading stage – ATC had no discretion regarding the payments to Plaintiff or the amount he was due, his ongoing eligibility, or the duration of the benefits. Plaintiff shall be given an opportunity to amend his complaint to allege facts, IF THEY EXIST, showing the nature of the benefits promised necessitated an ongoing administrative program.

## V. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss is GRANTED;
2. Plaintiff's complaint is dismissed with leave to amend;
3. Plaintiff may amend his complaint to cure the deficiencies outlined above within 14 days.

This Court is hugely busy. Counsel has a duty, as an officer of the Court, not to file an amended complaint if counsel knows the facts don't support the allegations, or the allegations don't state a valid claim. This Court has provided an in-detail analysis of the law. If counsel chooses to amend, it should be considered its last opportunity, since the Court will appropriately presume that the amended pleading will be the best and last researched and pled attempt.

IT IS SO ORDERED.

Dated: **April 20, 2017**         **/s/ Lawrence J. O'Neill**
UNITED STATES CHIEF DISTRICT JUDGE